We'll go now to the next case on the calendar. You can take a piece of candy. I put it there for a reason. The next case is Cortez v. Griffin. Mr. Unger, you have two minutes for rebuttal. Mr. Unger, I represent Paul Cortez, the appellant in this case. We agree with the district court that Mr. Cortez was denied effective assistance of trial counsel. We disagree with the district court that Mr. Cortez was not prejudiced by counsel's deficient performance. Now, the question of whether counsel's deficient performance prejudiced Cortez really requires us to resort to the strength or lack of strength of the evidence against him. And this was not a case where the evidence of guilt against Cortez was overwhelming, no matter how many times the prosecution repeats that argument. The case against Cortez was circumstantial. No weapon recovered, no DNA linking him to the crime, no surveillance videos which linked him to any of the criminal activity, no eyewitnesses. The shoes or boots that left sole markings at the crime scene were not recovered. And the size of the footwear, which was either size 9 or size 10, was acknowledged to be the most common size of men's footwear. But it wasn't just the size. It was the model, the brand. Yes, not recovered. And he was wearing similar shoes that very evening? I mean, the shoes were never introduced into evidence. There are many types of footwear that look alike. I mean, I don't know what Your Honor is wearing on your feet right now, but it's probably very similar to what I'm wearing. I mean, what about the self-cite records? Okay. The evasive conduct, the lying, the evidence of motive? Well, we could actually ask the same question of the roommate because a lot of those same factors applied to him. Now, look, what you have here is all circumstantial evidence. There were many phone calls that Cortez made to the victim. Remember, this is back in 2005. Today, there would probably be hundreds or thousands of text messages. Back then, if I recall, in order to send a text message, you had to press the pad several times to get to the letter you wanted. They were very cumbersome to send. So people actually made phone calls in that era. It sounds funny to say that era. It's 20 years ago, but it's a fact. Then there were numerous phone calls. Right, but that abruptly stopped and don't resume after the murder. So the jury could infer from that that he knew exactly why she wasn't going to pick up and, therefore, there was no point in calling, right? Now, in fact, there was a phone call that would have been made, according to the timing that the prosecutor established, after the death of the victim. There was a phone call. And after that, Mr. Cortez met with other people. He was calling a number of other people, wound up socializing that night with a group of other people. So not so strange and not so suspicious under those circumstances. And you also have motive, which was argued by the prosecution and continues to be. I don't really see a motive. I don't see it at all. He had a relationship with the victim. They seemed to be on the outs at the time. He seemed to be obsessed with her. There was even an entry where he fantasized about killing her. Okay. There were many, many entries that Mr. Cortez made in his books. He had been keeping them since he was about 16 years old. Thousands and thousands of them. There was an entry which he acknowledged was about a victim where he fantasized about cutting her throat. Well, you know, that was something he wrote. Is that not some evidence of motive? Well, I don't think so. Because we all have thoughts, and some people write those thoughts down because they think it's poetic or it's just something that they want to do. I mean, if it was really that direct evidence of a motive, why didn't he destroy the ledgers? Why didn't he destroy the diaries that he was keeping? It really, I think, is very weak evidence that he was upset maybe that he wasn't seeing her on a regular basis. I'll grant you that. Was he angry or was he jealous? I'll even concede that. What, to murder her? I don't think that that was enough of a motive. I really don't. Look, we could, I guess, quibble or disagree as to whether it was overwhelming or not. The real question is what it is that defense counsel failed to do that would have made a difference. Well, but I think it is important to talk about the relative weakness of the case. I guess, but you've got two and a half minutes to go, so I think we're going to go to the main event. So, clearly. The other issue is EDPA deference. Sorry? Deference, the deference that we have to give to the State court conclusions. I acknowledge that the burden is a high one. I'm not running away from that, but I think it's been met in this case. Trial counsel failed to conduct a sufficient, adequate investigation of the latent fingerprint evidence. I think that's clear. The district court so found. And all they had done, and obviously defense counsel must have thought the evidence was important just by getting an expert in the first place. But it seems that the prosecution witness basically conceded the point that you were trying to make on appeal, which is that it's possible that the fingerprint was placed before the blood hit it. The blood went on top of the fingerprint, not the fingerprint on top of the blood. So that was argued to the jury already. So why would it not be cumulative to do the testimony that you think should have been introduced? Because it wasn't offered, it wasn't questioned competently in a persuasive manner. If you have a fingerprint expert, that's all that witness is there for to explain whether or not the latent fingerprint could have been deposited before the blood was deposited on the wall. You can't conduct a course examination to make that point. She needed the expert. She had gotten the expert. And then as soon as the expert made a request, look, I need to see the sheetrock, just ignored him and just dropped the whole thing. They dropped the ball. That's what happened here. There was no explanation for that. From that, then the jury would be asked to conclude that it couldn't authoritatively establish that Cortez's fingerprint was left in blood as opposed to having been on the wall before the murder. That's the point, right? Well, that was the prosecutor's main point. That was the defense counsel's summation, right? That was in the summation. Yes, but it falls flat when you have experts called by the prosecution. I mean, you're not offering like a smoking gun. You're offering sort of further corroboration of a point that had already been conceded by the prosecution. Well, but not necessarily, because there was also, if you had seen the post-conviction affidavits, that wasn't the only expert that was involved in this case. And there was an affidavit submitted by the Habers who actually stated affirmatively, you know what? We don't need to see the sheetrock. From our observation of this evidence, if you have a bloody surface, a wall, and the blood is still wet or sticky, and you place a finger on it, that's not a latent fingerprint. That's a patent fingerprint. You're going to actually see the ridges from the finger appear with the naked eye. You don't need powder in order to bring it up and make it visible. So they had certainly other forms of evidence that would have completely undermined the prosecution's case, which they never bothered to do. And it wasn't like it came as a surprise. I mean, so how would that undermine the prosecution's case? I mean, if I was at the murder and I had a fingerprint that went down, and then when I split the throat of the victim, the blood went on top of my fingerprint, I mean, that's not exculpatory. The fact that my fingerprint was there first, as opposed to touching the blood second, are both consistent with my being there, right? Well, there was no dispute that Mr. Cortez was never in the victim's apartment previously. He admitted that. I think that was clear. So, yes, if the fingerprint was left before. My point is that it's not exculpatory. It may be an explanation for what is otherwise a very damning piece of evidence, but it's not exculpatory. I'll concede that point, but it certainly would undermine the prosecution's argument to the jury that this proves, the bloody fingerprint proves that Cortez is the killer. He couldn't make that argument if he had left the fingerprint innocently on the wall on a prior occasion and then the blood spatter on the wall brought the fingerprint out. Can you sort of, if we're sort of imagining what it would look like if that piece of evidence was in the mix more authoritatively, can you sort of spin out how, in presenting the case, defense counsel would have dealt with the placement of that fingerprint within what appeared to be a handprint on the wall? Was there an explanation sort of for that aspect of it, or was it just a dumb luck? The problem that I have answering that question is, although a detective testified at trial that it looked like a handprint on the wall, that was never established at the trial. Was it contested? Not sufficiently. I don't think so. It really was not established at the trial. I think the prosecution, after the trial and after some of these post-conviction motions were submitted, I think they did some further investigation in terms of whether or not it was a handprint and the relationship of the item to where the fingerprint was eventually lifted from. But at the trial, that was not established at all, I think. Right. But now we're talking about sort of prejudice and what you can prove, and I think it probably runs both ways. And I guess I'm wondering whether in order to show prejudice, you'd also have to come forward with, at a minimum, a viable theory or rebuttal of it's a handprint. Right. I understand. But I'm wondering if you have that. Again, I don't think it was established as a handprint. It looked to a detective. But to show prejudice, knowing the government's theory that it is, is there evidence? You don't have an expert addressing that question, I guess. There were a number of experts who submitted affidavits in the post-conviction motions. They had very different opinions from the police experts. Did any of them say it wasn't a handprint? I think at least one or two of them said it couldn't be determined that it was a handprint. There was nothing to establish that. I know I'm over the time, but I just wanted to quickly address the video footage, which for no apparent reason, no plausible strategic reason, defense counsel failed to introduce, which would have basically established that it was the roommate who was observed leaving the crime scene after the time of the murder. I don't think we could just make any excuses or come up with any plausible explanations how defense counsel had failed to utilize that evidence. It was crucial to the defense. The roommate had testified. He left the apartment of the victim 20 minutes before the 911 call was made. This actually was a video that at the time of it was actually consistent with his first report to the police. All that was argued to the jury, right? I mean, there was evidence from which to argue that he was the murderer, and that was an argument that was made at the trial, right? In my brief, that's correct, but in my brief, as I use that old adage, a picture is worth a thousand words. You show the jury a video of the roommate leaving the crime scene at a time that had to have been after the murder, that's much more persuasive than just talking about it or course-examining about it. Well, I mean, it shows that he was leaving the crime scene, right? It shows him outside of the building. At a time which would have to have been after the murder. Well, I mean, the fact that he was outside of the building after the murder doesn't mean that he was inside the building and inside the apartment at the time of the murder. Well, I think the timing of it, look, that's a question for the jury. If the jury sees this, they're going to start questioning, wait a minute, this witness said he left the apartment 20 minutes before the 911 call. This is a time on the video which is squarely within that time period. Now they're backing off from that time because the ear witness who lived above the victim's apartment, he fixed the time of the murder at 6.25 p.m. And the video shows the roommate walking away at 6.37. That's clearly after the murder. Now, the prosecution has done everything they can to minimize the effect of that evidence, but they can't because they had an ear witness who they called who fixed the time of the murder pretty specifically by looking at the time on his cable box, by hearing the noises from below, dog barking, woman screaming, and a thud. I don't think you can get more conclusive than that. And he said it happened no later than 6.25 p.m., 12 minutes before the roommate seen on the video walking away. Based on that, the jury could easily have convicted the roommate, and they certainly could have acquitted Mr. Guitez. Thank you.  You've reserved two minutes for rebuttal. We'll now hear from Mr. Yarnell. Thank you. May it please the Court. Brent Yarnell from the New York County District Attorney's Office for the respondent. The upstairs neighbor, Andrew Gold, was reliable for proving that the murder happened while he was on the phone call that lasted from 6.18 to 6.40 p.m., but the upstairs neighbor was unreliable for identifying the precise point in time during the phone call when he heard the two screams and the thud. Well, wait a minute. The jury gets to decide what's reliable or not. He was very clear. He said it was five minutes in. The call started at 6.18. Now we put it at 6.23. And he said, well, no later than 6.25. I looked at the time on the cable box. Why isn't the jury entitled to credit that? Well, they're entitled to credit that, but my point would be he did say that, but he also gave other estimates for when in the phone call he heard the screams and the thud, and the estimates that he gave were inconsistent with each other. So, for example, on page A85 of the appendix, he says that he heard the two screams and the thud just a few seconds before he hung up the phone call. So one of the various estimates that he gave is entirely consistent with the theory that Hahn left the apartment around 6.36, 6.37. We don't know what time the phone call ended, do we? We do. We have the phone records from his fiancée, and they show that the phone call ended at 6.40 p.m. So what we've established in the record is that the latest time the murder could have occurred is 6.40 p.m. The video, even if you assume the timestamp is accurate, but the district court found you cannot assume, but let's assume the timestamp is accurate, that means that the latest time that Hahn could have left the apartment building is around 6.36, 6.37 p.m. That leaves a three- or four-minute window in which Petitioner can enter the apartment and kill Woods before her. So you're making, I think, a compelling argument to make to a jury that, yeah, I know Gold said quite confidently and definitively that it happened at 6.25, but we think he's not reliable for these reasons, and therefore there is this window that's inconsistent with the 6.30, that makes it all make sense. But the question is whether there's a reasonable probability that it would change the jury's assessment. And in order to get the murderer for Cortez, you have to have him in the apartment at the time of the murder, and you have to have the other guy out of the apartment at the time of the murder. And so if you have not just some general estimate of, based on how long he thought he was gone, but an Internet-driven timestamp that shows him leaving the apartment, heading down towards where his car was, doing the stuff he said he was going to do, at 6.37, don't you think that significantly impacts the jury's assessment of the relative likelihood of defendant versus the roommate having done it? I don't think so. I don't think it creates a substantial likelihood that Petitioner would be acquitted. You know, what I would concede is that I think you can argue that the video arguably narrows the window of time in which Petitioner could have entered and committed the murder. But it definitely shows that there is definitely a period of time in which Hahn was out and Petitioner could have done it. If the jury concludes that Gold, despite the level of confidence that he displayed in his testimony, if they conclude that your theory is right and that, in fact, the phone call ended a few minutes before 6.40, then you've got a theory to present to the jury. I'm just trying to figure out how we would. I'm trying to figure out. These are always speculative guessing games about what the jury would do with a different chunk of evidence. But it strikes me as very different if you have a time of death or a time of the event starting around 6.25 if the jury believes the witness, the State's star witness on that point as to the timing. I don't know how the 6.37 exit doesn't create a huge obstacle for the State in proving its case. Well, you have to start where the district court started, which is that it's not true that the precise time of death was fixed at 6.25 p.m. Gold was very consistent that the murder occurred while he was on the phone with his fiancée. And that's the kind of thing that someone would remember. It happened while I was on the phone. But when exactly it happened during that 20-minute phone call, 10-minute phone call, you know, that's just a harder thing for a person to remember. And Gold gave inconsistent – inconsistent – he's just all over the place. If you look through his – look through his testimony, which Petitioner included in the appendix, you will find multiple – multiple estimates. At one point, he said it's a few minutes into the call. At one point, he said 10 minutes into the call. At another point, he said just a few seconds before I hung up the phone. So I think that a jury could say that what we certainly know is that there is a window of time in which Petitioner could have done it. And once you have that, you look at all the other evidence, which the magistrate and the judge summarized on page 866 of the record – 666 of the record – showing that it was Petitioner and not Hans. So you have, obviously, the phone records showing Petitioner calling the victim and heading to her apartment just before the murder, not calling anybody during that critical time when Andrew Gold was on the phone and we know the murder occurred, and then after the murder, heading back home, never calling Woods again, calling other people but not her. That is highly inculpatory evidence. But remember calling Woods again. Like, he found out that she died the next day. So really what you're saying, the fact that he called her six times that day and didn't call her a seventh, like how much probative value does that really have? Well, it's that if you look at Exhibit 72, which is his phone records that day with the cell site information, what you see is that he is repeatedly calling her from 5 o'clock up until 5.56 p.m. He's repeatedly calling her. I don't have the exact number, but it's a lot of phone calls. And those phone calls stop right at 5.56 p.m., 20 minutes before the phone call starts, and that's when he never calls her again. He has one call. I thought he called at 6.33. Exactly. So our theory is that that's a pocket dial. It was a one-second call. It actually didn't go through to her cell phone, so it went through to the cell phone tower, but it wasn't long enough. So we don't know exactly what was going on there, but we hypothesize that it's a pocket dial. He hung up quickly. Okay, but, I mean, I'm trying to sort of pull apart the evidence versus theories about what the evidence might mean.  And you've just said that he stopped calling at 5.56 and had a pocket dial. I mean, if we're assuming that all those other things weren't pocket dials, they were intentional calls, I don't know why we wouldn't treat that as a call. Well, I mean, the evidence is that, you know, these other calls were going through to her, so he's making these calls. He's trying to reach her. Then at 6.33, basically, he makes this one-second call. You know, we don't obviously know what it was. He hasn't told us, and she's not here, and she didn't receive the call anyway. But if you look at the timing, you know, let's assume that Han left the apartment building at 6.36, 6.37 p.m. What we have then is that Petitioner is calling Woods as he's heading to her apartment. Then he stops calling her at 5.56. He's waiting outside her apartment, standing there. At 6.33, he makes this pocket dial. He aborts it for reasons we don't know. And then at 6.37, he sees Han exit the apartment, and he goes in. So it's all perfectly ---- So the defense at trial, the defense argued that it was Han who did it? Yes. That was what defense argued. Was there evidence, any evidence that implicated him in any way? There was no evidence that implicated him. There was evidence that exculpated him. So he wore sneakers, Adidas sneakers that didn't match the blueprints. He's the one who called 911, not inculpatory behavior. We have his colleagues at the building where he worked around the corner who testified to seeing him around 6.30 p.m. According to Petitioner, right after he slaughtered his girlfriend, they described his demeanor. They say he was calm, he was normal, not the way your demeanor would be if you had just slaughtered your girlfriend. I see that I have two minutes to go. I'd like to talk about the fingerprint briefly. First of all, as the district court found, Petitioner has not shown what the results of Moses' examination would have been. All the evidence in the Haber affidavit is evidence that defense counsel elicited from the people's experts on cross-examination and then presented before the jury. So this is all cumulative. This is all stuff that the jury has seen, and it's all stuff that does nothing more than establish that it's possible that the blood went over the fingerprint rather than vice versa, not that it's likely. And then even more, you know, we would say a fair-minded jurist could conclude that whatever Moses found, the results of his examination would have had very low probative value because there are two critical facts that Moses could not have refuted. Number one, the fingerprint matched a sample from Petitioner's left index finger. He had two of his own experts, including Moses, who confirmed that. And number two, the fingerprint was found connected to the left index finger of a bloody handprint that was clearly made by the killer's left hand. I would disagree with my friend on the question of whether the evidence at trial established that this was a handprint. Detective Entenman testified that it was a handprint. Detective Entenman was shown the photograph on page one of the people's supplemental appendix that shows the handprint. He took his hand and he put it right over that photograph to show where the palm and all the fingers were. It definitely was a handprint. The index finger was definitely connected to the left index finger of this handprint. And we would say that the only ---- The testimony was that this was a left hand or a right hand? So the testimony, they didn't say whether it's a left hand or a right hand. Detective Entenman put his hand over it, and the record just doesn't say which hand he used. It doesn't say which hand he used. But I think if you look at the photograph and you just go clockwise, it's clear that you're going from palm to pinky to ring finger, middle finger, et cetera. So I think it is a left hand. And we would just say that the only reasonable explanation ---- And the disputed fingerprint is in that same general vicinity. Right. Is that right? Yes, exactly. So if you look at page one of the supplemental appendix, basically it's the ---- there's a smudge mark on the top right-hand corner. There's kind of two smudge marks. And what we would say is that Petitioner was smearing the blood. So he makes that right-hand corner. On the left side, there's one smudge mark, and then there's a smear that connects it to the other one. So he presses his finger, moves it a little bit, and then leaves that other one. And that's where it is. And then if you look at page two of the supplemental appendix, that is a close-up of the smudge on the top right corner of page one, and that shows where the fingerprint is vis-a-vis the bloody spot. And what you can see is that the fingerprint is sticking right out from the bottom of the bloody spot. And we would just say that the only reasonable explanation for this correlation left-index finger to left-index finger is that the fingerprint was made when the killer put his left-index finger ---- Petitioner or the killer put his left-index finger and smeared the blood on that wall. There is simply no substantial likelihood that the jury ever would have believed that the killer happened to smear blood with his left-index finger over the exact same spot on the wall where Petitioner had left a left-index finger on a previous occasion. I see that I'm over my time. If there are no further questions, we ask that you affirm. Thank you. Thank you, Mr. Yarnell. All right. Mr. Unger, you have two minutes for rebuttal. Thank you, Your Honor. I mean, I applaud the prosecutor for making vigorous argument in support of this theory, but it's just that, a theory. There was no solid evidence to back it up. And Mr. Cortez has presented ---- But the detective testifying that this was a handprint and it kind of looks like a handprint. It could be. But it was never ---- That was presented to the jury. Right. I understand. But it was never established at trial. The handprint sort of ---- What does that mean, it was never established? The evidence was presented to the jury. The jury liked it. Well, the detective said, I looked at the wall, it looked like a handprint. So I figured that was a good piece of evidence to have examined. But that was the end of it. It was never established to be a handprint. That's all the only point I'm making. Now, the prosecutor is also talking about Mr. Gold, the upstairs neighbor, as being unreliable. I didn't hear the trial prosecutor call him unreliable. But the same arguments about the timeline were made at the trial. So I guess, I mean, it's not clear to me why the video would have radically changed the defense theory or the prosecution's theory. Well, it would enormously bolster it. But why? I mean, was someone suggesting that actually Mr. Hahn had left much earlier, that his timeline was off? He said when he left. Well, yes. I mean, the fellow workers at the building where he was a doorman put the time much, much earlier than what he claimed and what anybody claimed. But Hahn himself said he left 20 minutes or so before he called 911. Which is at 6.59 p.m. Right. So 6.39 is when he left, according to Hahn. Right. So that's completely consistent with the video. That's the point. At trial. That is the point. I mean, the point is that really everything you needed to argue was already there from Hahn himself and from the 911 call. But respectfully, Your Honor, at trial the prosecutor was not agreeing with this proposition. They were claiming, oh, they're way off on the times. It was much earlier. We didn't hear any of this. First of all, Mr. Gold, the ear witness, nobody challenged the 6.25 statement at the trial. Nobody. And the 6.37, that was way after. That's just a mistake. The roommate didn't remember it accurately. The video would have shown he was telling the police the truth in this first statement to the police. But then they backed off of it when it was no longer a convenient time for him to have left the apartment. That's the point. And the video couldn't be impeached. It couldn't be challenged as having a bad memory or being forgetful. It just is. And, again, the prosecutor making the argument that Cortez called the victim repeatedly, okay, he gave up. When he couldn't get through to her, he just stopped calling her. He made one more call, which would have been at a time, I believe, to be after the victim was killed. And then without a response, he just gave up. That doesn't prove motive. It doesn't prove anything. Was the roommate calm when he was at the building talking with his coworkers? Yeah, he was calm. He was also described as being calm when he called 911, standing next to his dead, bloodied roommate ex-girlfriend. He was very calm during that 911 call. So that's very consistent as well. I've used enough of my time, and I thank the Court. All right. Well, thank you. Thank you, Bob. We will reserve decision.